**In re the MARRIAGE OF Jimmy Michael USREY and Mary Lee Usrey.**

**Jimmy Michael USREY, Respondent,**

v.

**Mary Lee USREY, Appellant.**

**No. 16125.**

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 14, 1989.

Jeri Leigh Caskey, Alton, for appellant.

No appearance for respondent.

CROW, Presiding Judge.

Mary Lee Usrey ("Mary") appeals from a decree dissolving her marriage to Jimmy Michael Usrey ("Jimmy").[1] Mary's sole complaint is that the trial court erred in awarding Jimmy a 45 percent interest in the only tract of real estate owned by the parties.

Mary and Jimmy wed July 11, 1969. The union produced four children: a boy born April 27, 1970; a boy born January 12, 1973; a girl born August 13, 1975; and a boy born June 2, 1977.

Mary left the parties' home in Oregon County, Missouri, January 4, 1988, and, accompanied by the three youngest children, went to Michigan. The eldest child also left home that date but remained in

---

1. Jimmy also filed a notice of appeal (number 16105). His appeal was dismissed because he failed to perfect it in that he filed no brief as appellant. Rules 84.05(a) and 84.08, Missouri Rules of Civil Procedure (20th ed. 1989). All references to rules are to that edition.

Oregon County with friends about a month, then joined Mary and the other children.

As the issue before us is the division of property our first task is to identify, as best we can from the record, the various items of property and what they are worth. The trial court made no findings as to value—none having been requested—hence all issues regarding value are to be considered as having been found in accordance with the result reached. Rule 73.01(a)(2); *Petty v. Petty*, 739 S.W.2d 738, 740[1] (Mo. App.1987).

The lone parcel of real estate owned by the parties is an 80–acre tract on which the marital home sits. Jimmy testified the value of the property is $35,000; Mary testified the value is $48,000. The property is subject to a deed of trust securing a promissory note. The decree contains a finding that as of June 9, 1988, the unpaid principal of the note was $15,115.48. That finding is unchallenged on appeal.

Motor vehicles owned by the parties are:

1975 Ford pickup with 11–foot slide-in camper including refrigerator, cookstove, gas furnace and tank, commode and sink, bed, water pump and tank. Valued by Jimmy at $2,200, by Mary at $3,000.

1982 Pontiac automobile. Valued by Jimmy at $1,200, by Mary at $1,400.

1972 Ford Pinto automobile. Valued by Jimmy at $200, by Mary at $500.

1950 Chevrolet truck. Valued by Jimmy at $400, by Mary at $750.

1977 Yamaha motorcycle. Valued by Jimmy and Mary at $100.

After the separation Jimmy sold some farm animals. Receipts produced by him at trial showed he received, in the aggregate, $4,326.52 for them. Jimmy testified he still had a boar worth $160, two sows worth $150 each, and a meat hog worth $70–80. Mary valued the animals sold and those still on hand at $6,000 in the aggregate.

Jimmy admitted that after the separation he sold a large number of items including china, jewelry boxes, figurines, glasses, furniture and vases. He described the items as "everyday things you can buy in any junk store or any junk auction." Mary characterized the items as antiques, and maintained most of them were her separate property.

On June 9, 1988, while the dissolution action was pending, Mary, pursuant to court order, went to the parties' home accompanied by a deputy sheriff and picked up certain items including a television, clock, battery charger and tools. At that time she discovered receipts for a number of the items described in the preceding paragraph which Jimmy had sold at auction. Those receipts, according to our arithmetic, total $523.

On August 6, 1988, pursuant to court order, an auction of much of the remaining household contents, tools and appliances was conducted. The net proceeds, $918.29, were paid to Mary.

An asset described as Jimmy's California Field Ironworkers local 433 annuity trust fund has an agreed value of $9,373.83.

At trial Jimmy's evidence was that he had $2,517 cash on hand. Mary testified she had six dollars in her purse.

The dissolution decree awarded full custody of the parties' children to Mary, and granted Jimmy supervised visitation, the details of which are set forth *infra*. Jimmy was ordered to pay Mary $200 per month child support.

The decree awarded certain personal property to Jimmy and certain personal property to Mary, itemized *infra*. Because the trial court made no findings as to the value of the property it is difficult to compare the worth of the items awarded the respective litigants. As all value issues are deemed to have been found in accordance with the result reached, we shall assume the trial court believed the personal property awarded Jimmy was worth the lowest amount shown by the evidence and that the personal property awarded Mary was worth the highest amount shown by the evidence. That formula produces a result whereby Mary receives a larger percentage of the aggregate value of the personal property than she would if we assigned the personal property awarded her the lowest

value shown by the evidence and the personal property awarded Jimmy the highest value shown by the evidence. Obviously, the greater percentage Mary receives, the less cause she has for complaint.

The decree awarded Jimmy the following items, described by the decree as "personal marital property in his possession":

| | |
|---|---|
| his personal items | [no evidence of value] |
| proceeds from sale of items he disposed of prior to trial | |
|    livestock | $ 4,326.52 |
|    china, jewelry boxes, figurines, etc. | 523.00 |
| freezer and its contents in marital home | [no evidence of value] |
| 1975 Ford pickup with slide-in camper and accessories | 2,200.00 |
| 1950 Chevrolet truck | 400.00 |
| 1977 Yamaha motorcycle | 100.00 |
| livestock on hand | 530.00 |
| California Field Ironworkers local 433 annuity trust fund | 9,373.83 |
| TOTAL | $17,453.35 |

Mary's brief points out that the decree is silent as to Jimmy's $2,517 cash on hand. We observe, however, that Jimmy, in response to a question about what happened to the money he received from the things he sold, testified: "Well, I've used it to live off of. I paid her part of it.[2] I have a little left." It is thus inferable that the trial court considered Jimmy's $2,517 cash on hand as the remainder of the proceeds from the items he sold prior to trial, which proceeds were awarded to him.

The decree awarded Mary the following items, described by the decree as "personal marital and nonmarital property in her possession":

| | |
|---|---|
| her personal items she took with her when she left the marital home | [no evidence of value] |
| proceeds from sale of items August 6, 1988, per court order | $ 918.29 |
| 1972 Ford Pinto automobile | 500.00 |
| 1982 Pontiac automobile | 1,400.00 |
| TOTAL | $2,818.29 |

The decree contained this provision regarding the real estate:

"... The marital real estate ... is awarded forty-five percent ... to [Jim-

my] and fifty-five percent ... to [Mary]....

The real estate promptly shall be listed for sale with at least one real estate broker.... The listing price shall be a fair price as determined by the broker. If the property does not sell within a year after entry of this decree, it shall be auctioned off by the sheriff at the courthouse steps. [Jimmy] may live on the real estate until it is sold, and [Jimmy] shall make the payments on the ... promissory note secured by deed of trust until the property is sold. [Jimmy] shall receive credit for payments he makes after 5 August 1988."[3]

We have no way, of course, to know what the unpaid principal on the note was as of the date the decree was signed (December 12, 1988), but we do have the trial court's undisputed finding that the unpaid principal was $15,115.48 as of June 9, 1988. Assigning the real estate the value given it by Mary ($48,000) and deducting the $15,115.48 lien, we have a net value of $32,884.52. Fifty-five percent of that is $18,086.49. Forty-five percent is $14,798.03. Mary's $18,086.49 interest in the real estate, added to the $2,818.29 worth of personal property awarded her and her six dollars cash on hand, amounts to $20,910.78.

Jimmy's $14,798.03 interest in the real estate, added to the $17,453.35 worth of personal property awarded him, amounts to $32,251.38.

The above computations demonstrate that Mary receives, at best, 39 percent of the marital property, while Jimmy receives 61 percent.

Assigning the real estate the value given it by Jimmy ($35,000) and deducting the $15,115.48 lien produces a net value of $19,884.52. Fifty-five percent of that is $10,-

2. An order entered two months before trial commanded Jimmy to pay Mary $125 for travel expense and $50 per week child support pendente lite. Court records show that after this order and prior to trial Jimmy paid Mary $475.

3. The date of trial.

936.49. Forty-five percent is $8,948.03. Using these figures, Mary's $10,936.49 interest in the real estate, added to the $2,818.29 worth of personal property awarded her and her six dollars cash on hand, amounts to $13,760.78. Jimmy's $8,948.03 interest in the real estate, added to the $17,453.35 worth of personal property awarded him, amounts to $26,401.38.

These computations demonstrate that if Jimmy's value ($35,000) is assigned to the real estate, Mary receives 34 percent of the marital property, while Jimmy receives 66 percent.

As noted in the first paragraph of this opinion, Mary's sole assignment of error is that the trial court wrongly awarded Jimmy a 45 percent interest in the real estate. Mary maintains Jimmy was guilty of "great and patent misconduct which placed extra burdens" on her.

Mary directs our attention to the conversations between the trial court and the parties' children. The eldest child told the trial court: "I'm too scared to get around him. I don't want to be ever near him." The eldest child was fearful of seeing Jimmy alone in a room with a deputy sheriff just outside. Asked by the trial court whether he felt he would be in physical danger, the eldest child replied: "Yes, I would be.... All I have to do is say one wrong [word], and I'll be—he'd mess me up." The child added: "All my brothers and my sister are scared to death of him."

The second child told the trial court about whippings inflicted on him and the eldest child by Jimmy. Asked how often at least one child would receive a spanking, the second child replied, "At least daily at the minimum, sometimes two or three times a day." The child revealed Jimmy used, among other implements, a "pig whip" and a hanger. Asked whether Mary gave the children the choice of remaining with Jimmy or going with her when she left the marital home for Michigan, the child asserted it was his choice, and that of his sister and youngest brother, to accompany Mary. As to visitation with Jimmy, the child said: "I'm afraid of him. He's got a really bad temper. You don't know what he's going to try next."

The parties' daughter told the trial court that Jimmy, in disciplining her, struck her on the face and arms with his hand. She recounted Jimmy had struck the eldest child in the face with his fist, and that the second child received lumps on his head when struck by Jimmy. She added that when they went to Michigan the second child "couldn't hardly move his—his arms were really sore from him hitting him all the time." Asked who made the decision to go to Michigan, the daughter answered that the children all asked Mary to do it. The daughter explained they took few belongings with them because "we were scared dad might catch us, then really hurt us." Asked how often Jimmy disciplined the children, the daughter replied, "Every day, every one of us." Regarding visitation, the daughter said, "I don't want to see him again."

The youngest child told the trial court that Jimmy whipped the children "[a] lot—like once a day at least." Asked why, the child replied: "He didn't have many reasons. If ... something was broken around the house, he'd just blame someone and whip them if he didn't know who did it." The child maintained he, his brothers and his sister talked Mary into leaving Jimmy and taking them with her. Regarding visitation with Jimmy, the child said, "I wouldn't want it."

Jimmy denied mistreating or physically abusing the children, accused Mary of turning them against him, and maintained she kidnapped them.

The trial court made no findings on those issues, but did include in the decree the following provision regarding Jimmy's visitation:

"[Jimmy] should have only supervised visitation with said children, which he shall exercise in the home and in the presence of [Mary's] sister Linda Sebert, on each even numbered Saturday of the month from 9:00 o'clock in the morning to 10:00 o'clock that night[.]"

As all fact issues are deemed found in accordance with the result reached, we in-

fer the trial court believed the children's accounts of the abuse inflicted by Jimmy, otherwise the trial court would not have placed the above restrictions on Jimmy's visitation.

Another instance of Jimmy's misconduct, according to Mary, was that after she and the children departed Jimmy gave away all of her clothes she had left in the marital home. Jimmy admitted this.

Mary also indicts Jimmy for selling the articles Mary claims were antiques and belonged to her separately. Jimmy disputed Mary's claim that the articles were her separate property. The closest the trial court came to a finding on that issue was the provision in the decree awarding Jimmy, as "personal marital property in his possession," the proceeds from the sale of items he disposed of prior to trial. That suggests the trial court rejected Mary's contention that the china, jewelry boxes, figurines, glasses, furniture, vases and other items sold by Jimmy were her separate property. Consequently, we cannot declare Jimmy guilty of misconduct on that ground.

■ Section 452.330.1(4), RSMo Supp. 1988, provides that in dividing marital property the court shall consider all relevant factors including the conduct of the parties during the marriage. A trial court must make a fair and equitable division of the marital property in light of the circumstances attending each individual case; an equal division is not required. *Dardick v. Dardick*, 670 S.W.2d 865, 869[4] (Mo.banc 1984). A trial court is vested with considerable discretion in dividing marital property, and an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. *Id.* at 869[5]. A husband's misconduct toward his family is alone sufficient to justify an award of a greater proportion of the marital property to the wife. *In re Marriage of Kueber*, 599 S.W.2d 259, 261[3] (Mo.App. 1980).

■ Given the record before us and the findings we have gleaned from it by implication, we are persuaded that the trial court abused its discretion in awarding Jimmy such a large percentage of the marital property. As we have seen, Mary was awarded, at best, 39 percent of the marital estate, while Jimmy was awarded at least 61 percent.

In making those calculations we have not taken into account one asset shown by the evidence. Jimmy testified that when Mary departed she took $1,400 from "our accounts." Mary admitted taking the $1,400, but insisted $1,000 of it belonged to the eldest child, being a portion of the proceeds of a settlement for an accidental injury he sustained. Jimmy admitted funds had been received from the settlement in January, 1987. The trial court made no finding regarding the $1,400, and it is unmentioned in the decree. However, even if we treat the entire $1,400 as marital property received by Mary, that does not substantially alter the proportion of the marital assets she received. Adding that sum to the marital estate gives Mary, at best, 41 percent of the marital property, while Jimmy receives 59 percent.

Our examination of the record has turned up no evidence justifying a division of the marital property so heavily weighted in favor of Jimmy. He filed no brief, so we do not have the benefit of any justification he might have supplied.

We have concluded that the parties' interest in the lone tract of real estate should be apportioned 72 percent to Mary and 28 percent to Jimmy. That produces a result whereby Mary receives, at best, 51 percent of the marital property and Jimmy at least 49 percent, treating the $1,400 taken by Mary as marital property and assigning the real estate a value of $48,000. If the real estate is worth only $35,000, as Jimmy testified, Mary's share of the marital property drops to 45 percent.

The decree, as we have seen, provided that if the real estate remained unsold for a year after entry of the decree it would be auctioned by the sheriff. The decree further provided that Jimmy could live on the property until it is sold, that he was to make the payments on the note secured by

the deed of trust, and that he would receive credit for all payments he made after August 5, 1988.

Generally, at least two requirements must be met before a trial court should order a sale of marital property: (1) a finding that the property cannot be divided in kind, and (2) a finding that a sale would be in the best interest of one or both of the parties. *In re Marriage of Wilson,* 727 S.W.2d 226, 227[1] (Mo.App.1987); *Swinford v. Swinford,* 682 S.W.2d 189, 191[3] (Mo.App.1984). Here neither party asked the trial court to divide the real estate in kind and there is no evidence it was susceptible to division, particularly in view of the lien securing the promissory note. Additionally, because of the circumstances of this case and the parties' limited assets there does not appear to be any feasible way to award one party the entire interest in the real estate and offset that by awarding the other party martial property of commensurate value. The record therefore does not demonstrate error in the trial court's determination that the real estate should be sold.

We see no reason, however, to allow Jimmy credit for all payments made by him on the promissory note after August 5, 1988. The payments, according to Jimmy's evidence, are $201.41 per month. At time of trial he was occupying the property as his home and presumably will receive an income tax deduction for the amount of each payment he makes that represents interest. Furthermore, for each dollar that his payments reduce the principal on the note he will in effect receive 28 cents back when the property is sold. The provision in the decree allowing Jimmy credit for all payments he makes after August 5, 1988, should be stricken. *Cf. Bacon v. Bacon,* 670 S.W.2d 594, 597[9] (Mo.App.1984).

The decree of dissolution of marriage is affirmed in all respects except that portion pertaining to the real estate, which is reversed. The cause is remanded to the trial court with directions to enter an amended decree providing that upon sale of the real estate the net proceeds shall be apportioned 72 percent to Mary and 28 percent to Jimmy. Jimmy shall receive no credit for any note payments he has heretofore made or any he shall hereafter make. He may, however, occupy the real estate until it is sold, and he shall continue to make the payments on the promissory note secured by the deed of trust on the real estate until the sale. If he fails to make any such payment and it becomes necessary for Mary to do so to prevent foreclosure, she shall be reimbursed for such payments out of the sale proceeds before they are apportioned as heretofore specified, so long as she does not reoccupy the property prior to sale.

As a year has passed since entry of the decree, the new decree shall provide that if the property is not sold for an agreed price on the open market within six months after the date of our mandate, it shall be sold at public auction for cash. *See: Swinford,* 682 S.W.2d at 191–92.

GREENE, J., and DOUGLAS E. LONG, Jr., Special Judge, concur.